IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-01147-RPM-CBS

PHILLIP GARDNER, and
PATRICK SMITH
     Plaintiffs,
v

LIVING ART TATTOO STUDIO, LLC, and
MICHAEL PANTOJA,
     Defendants.

---

RECOMMENDATION REGARDING PLAINTIFFS' MOTIONS FOR DEFAULT
JUDGMENT

---

Magistrate Judge Shaffer

     This matter comes before the court on Plaintiffs' Motions for Default Judgment (doc. #11

and doc. #21), filed on October 18, 2013 and December 13, 2013, respectively.  The pending

motions seek to have default judgment entered against Defendants, pursuant to Fed. R. Civ. P.

55(b)(2).  These matters were referred to the Magistrate Judge pursuant to the Order of

Reference dated October 21, 2013 (doc. #14) and the memorandum dated December 16, 2013

(doc. #22).  The court has carefully considered the motions and related briefing, the comments

offered by the parties during the December 10, 2013 and December 18, 2013 hearings, the entire

case file, and applicable case law.  For the following reasons, I recommend that Plaintiffs'

Motions for Default Judgment be granted.

## PROCEDURAL BACKGROUND

     Phillip Gardner and Patrick Smith filed their Complaint on April 30, 2013, asserting

violations of the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. § 201 *et seq.* and the

Colorado Wage Claim Act ("CWCA"), C.R.S. § 8-4-101, *et seq.* against Living Art Tattoo

Studio, LLC ("Living Art Tattoo Studio" or "the Studio") and its owner Michael Pantoja (collectively "Defendants").   Defendants were served with a summons and copy of the Complaint in May 2013.  Defendants failed to answer or otherwise respond to the Complaint.

Plaintiffs assert two claims under the FLSA as to both Defendants, and one claim under the CWCA as to Living Art Tattoo Studio.  These claims arise out of Plaintiffs' employment with Defendants in 2012.  Plaintiffs claim Defendants violated the FLSA by failing to pay minimum wage pursuant to 29 U.S.C. § 206, and the overtime wages required by 29 U.S.C. § 207.  Plaintiffs claim Living Art Tattoo Studio violated the CWCA by failing to pay fees and tips that were due and owing to Plaintiffs at the end of their alleged employment.  Plaintiffs seek through the pending motions to have default judgment entered against Defendants for unpaid minimum wages and overtime wages, liquidated damages, statutory penalties, interest, and attorney fees.

District Judge Matsch issued an Order to Show Cause on October 9, 2013 (doc. #6) why the action should not be dismissed for failure to prosecute.  Plaintiffs subsequently filed a Motion for Entry of Default on October 18, 2013 (doc. #7), which was rejected for failure to attach affidavits or declarations pursuant to Fed. R. Civ. P. 55.  Plaintiffs immediately filed a second Motion for Entry of Default (doc. #9), accompanied by Mr. Gardner's Declaration in Support of Motion for Entry of Default (doc. #10) and Mr. Gardner's Motion for Default Judgment (doc. #11).  Plaintiffs also filed a Response to the Order to Show Cause (doc. #12) on October 18, 2013, whereby counsel requested additional time until November 15, 2013 to file a motion for default judgment on behalf of Mr. Smith.  The clerk entered default against Defendants on October 21, 2013.  The same day, Judge Matsch issued an Order dismissing the Order to Show

Cause and granting counsel's request for an extended deadline by which to file Plaintiff Smith's motion (doc. #16).

This court directed the parties to appear at an evidentiary hearing held December 10, 2013.  Mr. Gardner and his attorney appeared without Mr. Smith.  Mr. Pantoja appeared *pro se*, and argued that neither he nor Living Art Tattoo Studio were liable because Plaintiffs were independent contractors.  The undersigned explained that Mr. Pantoja could not argue questions of liability without first setting aside the clerk's entry of default, and advised that Living Art Tattoo Studio must be represented by counsel.  This court then set a second evidentiary hearing for December 18, 2013.  Mr. Smith thereafter filed a Motion for Default Judgment on December 13, 2013 (doc. #21), approximately one month out of time.[1]

Mr. Pantoja appeared *pro se* for the December 18 evidentiary hearing, and acknowledged he had been unable to retain counsel.  The undersigned again instructed Mr. Pantoja that he could not represent his corporation.  Following the direct and cross-examination of Plaintiff Gardner as witness, the court ordered Mr. Pantoja to submit any evidence regarding damages no later than December 23, 2013.  The court granted Plaintiffs' counsel seven days to file a response, if any.  Mr. Pantoja subsequently filed bank statements for the relevant time period belonging to Living Art Tattoo Studio, and records purporting to reflect Plaintiffs' work schedules and corresponding compensation.  Plaintiffs did not respond.

## ANALYSIS

Rule 55(a) of the Federal Rules of Civil Procedure provides that "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend and that fact is made to appear by affidavit or otherwise, the clerk shall enter the party's default."  Fed. R.

---

[1] Although Mr. Smith filed his motion out of time and without leave, the court does not find that the month delay resulted in prejudice to Defendants.  When Mr. Smith filed his motion Defendants were in default, Mr. Pantoja was still attempting to procure representation, and the court had not yet held the second evidentiary hearing.

Civ. P. 55(a).  In cases where the claim is not for a "sum certain," "the party must apply to the court for a default judgment."  Fed. R. Civ. P. 55(b).  When a default judgment is entered, "facts alleged in the complaint are taken as true, except facts relating to the amount of damages, which must be proven in a supplemental hearing or proceeding."  *United States v. Craighead*, 176 Fed. App'x 922, 925 (10th Cir. 2006) (unpublished) (quoting *Am. Red Cross v. Cmty. Blood Ctr. Of The Ozarks*, 257 F.3d 859, 864 (8th Cir. 2001)).  "[D]efault judgment must normally be viewed as available only when the adversary process has been halted because of an essentially unresponsive party."  *In re Rains*, 946 F.2d 731, 732-33 (10th Cir. 1991).

A party is not entitled to a default judgment as a matter of right; rather the entry of a default judgment is entrusted to the sound judicial discretion of the court.  *Bixler v. Foster*, 596 F.3d 751, 762 (10th Cir. 2010) (citing *Nishimatsu Constr. Co. v. Houston Nat'l Bank,* 515 F.2d 1200, 1206 (5th Cir.1975)) ("[A] defendant's default does not in itself warrant the court in entering a default judgment.").  The first step before granting a motion for default judgment is for the court to ensure it has personal jurisdiction over the defaulting defendants and subject matter jurisdiction over the action.  *See Williams v. Life Sav. & Loan,* 802 F.2d 1200, 1202–03 (10th Cir. 1986).  Second, the court must consider whether the well-pleaded allegations in the complaint support a judgment on the claims against the defaulting defendants.  10A Charles A. Wright, Arthur R. Miller & Mary K. Kane, *Federal Practice and Procedure* § 2688, at 63 (3d ed. 1998) ("a party in default does not admit mere conclusions of law"); *see also Nishimatsu Constr. Co.,* 515 F.2d at 1206–08 (vacating district court's entry of default judgment because the pleadings were insufficient to support the judgment).  "There must be a sufficient basis in the pleadings for the judgment entered." *Nishimatsu Constr. Co.,* 515 F.2d at 1206.

When "ruling on a motion for default judgment, the court may rely on detailed affidavits or documentary evidence to determine the appropriate sum for the default judgment." *Seme v. E & H Prof'l Sec. Co., Inc.*, No. 08-cv-01569-RPM-KMT, 2010 WL 1553786, at \*11 (D.Colo. Mar. 19, 2010) (unpublished); *see also Hennecke, Inc. v. Advanced Bldg. Composites, LLC,* No. 10-2054, 2010 WL 2464842, at \*2 (D. Kan. June 4, 2010) (unpublished) ("A plaintiff cannot satisfy the certainty requirement simply by requesting a specific amount.   [The plaintiff] must also establish that the amount requested is reasonable under the circumstances." (internal quotation marks and citation omitted)); *but see OTO Software, Inc. v. Highwall Techs., LLC*, No. 08-cv-01897-PAB-CBS, 2011 WL 3236049, at \*5 n. 5 (D.Colo. July 5, 2011) (unpublished) ("While a plaintiff cannot recover damages that are speculative, an injured party is not required to prove damages with absolute certainty.").   Damages "usually must be established by the plaintiff in an evidentiary proceeding in which the defendant has the opportunity to contest the amount." *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.,* 973 F.2d 155, 158 (2d Cir. 1992).

For the reasons set forth below, I find that Plaintiffs were employees under the FLSA and CWCA and are entitled to an award of damages.

A.      *Federal Labor Standards Act*

The FLSA provides covered workers a minimum wage and guarantees overtime compensation for hours worked in excess of forty hours a week.   29 U.S.C. § 201, *et seq.* Individuals and enterprises defined as "employers" are liable to their employees for unpaid minimum wages, unpaid overtime compensation, and liquidated damages of an equal amount. *Id.* § 216(b). [2]   The FLSA defines an "employee" as "any individual employed by an employer."

---

[2] Plaintiffs have pled that Living Art Tattoo Studio is an enterprise engaged in interstate commerce with a gross annual income in excess of $500,000 (doc. #1).   *See* 29 U.S.C. §§ 206, 207.

*Id.* § 203(e)(1).  It defines "employ" as "to suffer or permit to work."  *Id.* § 203(g).  Furthermore, "[t]he definition is necessarily a broad one in accordance with the remedial purpose of the Act." *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1058 (2d Cir. 1988) (internal citations omitted).

Accordingly, the "economic realities" of the employment relationship govern the designation of the worker under the FLSA.  *Dole v. Snell*, 875 F.2d 802, 804-05 (10th Cir. 1989). The question is whether the individual is economically dependent on the business to which he renders his services or is, as a matter of economic fact, in business for himself.  *Id.* (citing *Doty v. Elias*, 733 F.2d 720, 722-23 (10th Cir. 1984)); *Bartels v. Birmingham*, 332 U.S. 126, 130, 67 S.Ct. 1547, 1549, 91 L.Ed. 1947 (1947).  The Tenth Circuit considers five factors in applying the economic reality test:

> (1) the degree of control exerted by the alleged employer over the worker; (2) the worker's opportunity for profit or loss; (3) the worker's investment in the business; (4) the permanence of the working relationship; and (5) the degree of skill required to perform the work.

*Snell*, 875 F.2d at 805 (citing *Doty*, 733 F.2d at 723).  A sixth factor often considered is the extent to which the work is an "integral part" of the alleged employer's business.  *Snell*, 875 F.2d at 805.

Plaintiffs allege in their Complaint that they entered into a lease agreement with Living Art Tattoo Studio whereby they provided body piercing services in exchange for 50% of the fees recovered from the services.  The lease agreement (doc. #21-2) specifies that each Plaintiff "is not in any way or form an employee of Lessor."  Plaintiffs allege that Defendant Pantoja nonetheless treated them as employees.  The Tenth Circuit has noted that the designation given to a worker is not necessarily outcome determinative of that worker's employment status.  *See, e.g., Baker v. Flint Engineering & Const. Co.*, 137 F.3d 1436, 1440 (10th Cir. 1998) (citing *Watson v. Graves,* 909 F.2d 1549, 1553 (5th Cir.1990).  Courts are not limited by contractual

6

terminology used by the parties or by traditional common law concepts of "employee" or "independent contractor." *Snell*, 875 F.2d at 804 (citing *McLaughlin v. Seafood, Inc.*, 861 F.2d 450, 452 (5th Cir. 1988)), *modified*, 867 F.2d 875 (1989) (citation omitted).  Indeed, "an employer's self-serving label of workers as independent contractors is not controlling." *Brock*, 840 F.2d at 1059 (internal citations omitted).

The court accepts Plaintiffs' well-pleaded allegations as true for liability purposes as a consequence of Defendants' default.[3]  *Olcott v. Delaware Flood Co.*, 327 F.3d 1115, 1125 (10th Cir.2003) (citing *Jackson v. FIE Corp.*, 302 F.3d 515, 525 (5th Cir.2002); *see also Nishimatsu Constr. Co.*, 515 F.2d at 1206; Wright, Miller & Kane, *supra*, § 2688.

*1.  Control*

According to Plaintiffs, Mr. Pantoja dictated their work schedule, monitored their hours, and administered discipline for arriving late to work.  Mr. Pantoja assigned customers to Plaintiffs at his discretion.   He also provided the bulk of the body piercing supplies.  Plaintiffs were not allowed to set the prices for their services; Mr. Pantoja established the rates for piercings and created "daily specials" and promotional pricing plans that Plaintiffs were required to honor.   Mr. Pantoja drafted paperwork for Plaintiffs to complete for each customer and imposed personnel policies that Plaintiffs were expected to follow.  Defendants collected the fees and tips generated by Plaintiffs' services, and thus controlled the distribution of payment. Plaintiffs worked exclusively for Living Art Tattoo Studio, as required by Mr. Pantoja.  These allegations demonstrate that Defendants exercised a great deal of control over the services that Mr. Gardner and Mr. Smith provided.

---

[3] Defendant Pantoja appeared before the court *pro se* following his default.  Living Art Studio never procured representation, and is subject to default on this additional basis because a corporation cannot appear in federal court without licensed counsel.  *See, e.g., Rowland v. California Men's Colony, Unit II Men's Advisory Council*, 506 U.S. 194, 201-02, 113 S.Ct. 716, 721 (1993).

2.  *Profit and Loss*

Plaintiffs' allegations also demonstrate Defendants dictated the opportunity for profit or loss.  Defendants compensated Plaintiffs per project, and thus the more bodies Plaintiffs pierced the more money they made.  However, "toiling for money on a piecework basis is more like wages than an opportunity for 'profit.'"  *Snell*, 875 F.2d at 809 (internal citations omitted).  Mr. Pantoja established Plaintiffs' hours, set the pricing structure for Plaintiffs' services, and regularly offered Plaintiffs' services at a discounted rate.  In short, Plaintiffs had no control over the essential determinants of profits in a business, and no direct share in the success of the business.  Their earnings did not depend "upon their judgment or initiative," but on Defendants' need for their work.  *Snell*, 875 F.2d at 810 (citing *Robicheaux v. Radcliff Material, Inc.*, 697 F.2d 662, 666-67 (5th Cir. 1983)).  Plaintiffs did not reap a profit or suffer a loss based on their work; they were simply paid to pierce.

Under this scheme, Plaintiffs could not have experienced a business loss because they had made no investment.  *Snell*, 875 F.2d at 810 (citing *Sec'y of Labor, U.S. Dept. of Labor v. Lauritzen*, 835 F.2d 1529, 1536 (7th Cir. 1987)  ("Although the profit opportunity may depend in part on how good [the worker] is, there is no corresponding opportunity for [] worker loss…the [workers] have invested nothing except the cost of their work gloves, and therefore have no investment to lose.")).  Plaintiffs did not undertake the risks usually associated with an independent business.

3.     *Investment in the Business*

The question of investment is related to the profit and loss analysis, and the type of investment of which courts are concerned is "large capital expenditures, such as risk capital and capital investments, not negligible items, or labor itself."  *Baker*, 137 F.3d at 1442 (citing *Sec'y*

8

*of Labor, U.S. Dept. of Labor v. Lauritzen*, 835 F.2d 1529, 1537 (7th Cir. 1987)).  Plaintiffs have not indicated that they invested any money into Living Art Tattoo Studio or otherwise held equity.  Plaintiffs' allegations relevant to the "control" analysis demonstrate they did not use the studio as a means of conducting their own enterprise.  The lease agreement states that Defendants would provide "necessary and reasonable supplies to include paper towels, the station, utilities, aprons, [and] a credit card machine," and Plaintiffs would provide their "own … new needles, power supply, and other necessary and reasonable supplies as commonly used throughout the industry."  Plaintiffs allege to the contrary that Defendants provided them with the necessary materials to perform their work.[4]  According to Plaintiffs, their only expenditure was business cards, which Mr. Pantoja insisted they purchase and use to solicit business.

Plaintiffs' allegations suffice to show they had no investment in Living Art Studio that could place them in a position to sustain a capital loss.  Plaintiffs' small, indeed nonexistent, stake in the operation indicates their work was not independent of Defendants.

> 4.    *Skill and Independent Initiative*

The pleadings do not address the level of skill required for body piercing, or the level of skill that Defendants required upon hire.  This is but one component of the analysis, however, and not dispositive of the result.  *See Snell*, 875 F.2d at 805 n. 2 ("since factors such as the ones listed are simply analytical tools, their weight, number and composition are variable.  All relevant evidence may be considered.").  Furthermore, the fact that workers are skilled is not itself indicative of independent contractor status, "especially if the workers do not use those skills in any independent way.  *Baker*, 137 F.3d at 1443 (quoting *Martin v. Selker Bros., Inc.,*

---

[4] Even if Plaintiffs had been responsible for providing their own work supplies, this fact would not necessarily render them independent contractors.  *See, e.g., Baker*, 137 F.3d at 1442 ("Courts have generally held that the fact that a worker supplies his or her own tools or equipment does not preclude a finding of employee status") (internal citations omitted).

949 F.2d 1286, 1295 (3d Cir.1991)).   "A variety of skilled workers who do not exercise significant initiative in locating work opportunities have been held to be employees under the FLSA." *Brock*, 840 F.2d at 1060 (internal citations omitted).

Regardless of Plaintiffs' level of skill in body piercing, they were not allowed to exercise independent initiative.   Mr. Pantoja expected Plaintiffs to generate business by distributing business cards, but he controlled Plaintiffs' ability to work by scheduling their hours and assigning clients as he saw fit.

> 5.   *Permanence of the Working Relationship*

"Independent contractors" often work pursuant to fixed periods of employment and transfer jobs as work becomes available.   *Snell*, 875 F.2d at 811 (citing *Donavan v. Sureway Cleaners*, 656 F.2d 1368, 1372 (9th Cir. 1981)).   "Employees" typically work for only one employer, and the employment relationship is continuous and of indefinite duration.   *Id.*   The parties' lease agreements provided for month-to-month employment, and any party could sever the relationship with fourteen days' notice.   Mr. Gardner worked approximately 48 hours a week for 26 weeks and Mr. Smith worked approximately 42 hours a week for 8 weeks.   While neither Plaintiff worked for Defendants very long, the lease agreement contemplates an employment relationship of indefinite duration.

Furthermore, Plaintiffs worked exclusively for Defendants.   They did not provide body piercing services anywhere else during these times, and did not work in any other capacity. Finally, they relied on Mr. Pantoja for business.   Mr. Pantoja controlled the amount of fees Plaintiffs earned because he referred clients based on his discretion.   *See Baker*, 137 F.3d at 1443 ("the question is whether plaintiffs are economically dependent upon [defendant] during the time period they work for [defendant], however long or short that period may be") (internal citations

omitted).   With regard to this factor, Plaintiffs were treated more like employees than independent contractors.

### 6.   *Integral Part of the Business*

Living Art Tattoo Studio provides tattoo and body piercing services.  It was able to offer body piercing services, at least in part, because Plaintiffs worked there.  Plaintiffs were integral to the business insofar as they performed a function that was vital to the success of Living Art Tattoo Studio.

### 7.   *Individual Liability Under the FLSA*

The foregoing analysis demonstrates that Plaintiffs, as a matter of economic fact, depended on Defendants for the opportunity to render service.   Accordingly, Plaintiffs were employees of Defendants and subject to the FLSA.  The next question is whether Mr. Pantoja is personally liable to Plaintiffs under the FLSA as an employer.

The FLSA recognizes the shield from personal liability afforded by doing business in a corporate form.  *Baystate Alternative Staffing, Inc. v. Herman,* 163 F.3d 668, 677 (1st Cir. 1998). However, because the FLSA ultimately "'transcend[s] traditional common law parameters of the employer-employee relationship' individual liability under the FLSA can attach to corporate officers based on such factors as:"

> the significant ownership interest of the corporate officers; their operational control of significant aspects of the corporation's day to day functions, including compensation of employees; and the fact that they personally made decisions to continue operating the business despite financial adversity and the company's inability to fulfill its statutory obligations to its employees.

*Does v. Rodriguez*, 06–cv–00805–LTB, 2007 WL 684117, at *3 (D.Colo. 2007) (unpublished) (quoting *Baystate Alternative Staffing, Inc.*, 163 F.3d at 677-78).  Mr. Pantoja is the principal owner and operator of Living Art Tattoo Studio, and managed the business's daily operations.

Mr. Pantoja was responsible for hiring, setting the rates of pay, assigning customers, and supervising Plaintiffs' work.  Mr. Pantoja also disciplined Plaintiffs, which included suspension from work without pay.

Finally, Mr. Pantoja is responsible by implication for maintaining the operation of Living Art Tattoo Studio despite the business's inability to pay its employees.  The email from the Studio's accounting manager in response to Plaintiffs' demand for payment (doc. #21-8) demonstrates that management knew it owed back wages to Plaintiffs.  What is worse is management's demonstrated indifference in paying Plaintiffs in a timely manner: Plaintiffs were fired in September, demanded payment in November, and were told in December that due to a "slow period," the Studio would not pay the balances until January.   These allegations are sufficient to find that Mr. Pantoja qualifies as an "employer" under the FLSA and is subject to personal liability for Plaintiffs' back wages and overtime pay.

B.      *Colorado Wage Claim Act as to Living Art Tattoo Studio*

For covered workers, the CWCA ensures wages are paid in a timely manner, and provides relief in the event wages are not paid. Colo. Rev. Stat. Ann. § 8-4-101 *et seq.*; *see, e.g., Fang v. Showa Entetsu, Co., Ltd.*, 91 P.3d 419 (Colo. App. 1993) rehearing denied, certiorari denied 2004 WL 1301893.  I find that Plaintiffs were employees covered by the CWCA for the same reasons they were employees under the FLSA.  *See* Colo. Rev. Stat. Ann. § 8-4-101(4).

The CWCA provides that, if employment is terminated by the employer, "the wages or compensation for labor or service earned and unpaid at the time of such discharge is due and payable immediately." Colo. Rev. Stat. Ann. § 8-4-109(1)(A).  If an employer refuses to pay wages, the employee or a designated agent can demand payment within sixty days after the date

of separation.  Colo. Rev. Stat. Ann. § 8-4-109(1)(b)(3)(a).  If the employer does not transmit the employee's wages within fourteen days after the receipt of a demand, the employer is liable for the wages in addition to a penalty.  *Id.* § 8-4-109(3)(b); *see also Graham v. Zurich American Ins. Co.*, 296 P.3d 347 (Colo. App. 2012) ("The penalties for non-payment of compensation are mandatory if (1) the employee makes a written demand for payment and (2) the defendant does not pay within fourteen days.").  An additional penalty is mandatory if the "employer's failure to pay is willful."  Colo. Rev. Stat. Ann. § 8-4-109(3)(c).

Mr. Gardner alleges that Living Art Tattoo Studio owed him $11,257.50 in unpaid fees and $1,055 in unpaid tips when Mr. Pantoja severed his employment on September 26, 2012. He further alleges he demanded payment of the full amount from the Studio on November 17, 2012 (doc. #11-8), through his counsel, and received no response.  Counsel for Mr. Gardner corroborates the written demand in his signed declaration (doc. #11-9).  Mr. Smith similarly alleges that Mr. Pantoja severed his employment on September 26, 2012, and that the Studio owed him $3,619 in unpaid fees and $283 in unpaid tips at the time of severance.  He further alleges he demanded payment of the full amount on November 17, 2012 (doc. #21-7), through his counsel, and received no response.  Counsel for Mr. Smith corroborates the written demand in his signed declaration (doc. #21-9).

Plaintiffs further contend that Defendant Pantoja willfully withheld their wages, fees, and tips, and thus the Studio should be ordered to pay 50% of the sum owed in accordance with Section 8-4-109(3)(c).  The accounting manager's email admitting the Studio owed back wages combined with Plaintiffs' allegations that Mr. Pantoja refused their requests for payment and threatened violence suffices to warrant finding that Living Art Tattoo Studio wilfully withheld compensation.

C.      *Damages*

Plaintiffs seek unpaid compensation under both the FLSA and the CWCA.  Plaintiffs'

employee status entitles them to damages under one but not both.  *See Jiao v. Shi Ya Chen,* No.

03 Civ. 0165(DF), 2007 WL 4944767, at * 17 (S.D.N.Y. Mar. 30, 2007) ("Where a plaintiff is

entitled to damages under both federal and state wage law, a plaintiff may recover under the

statute which provides the greatest amount of damages"); *see also Mason v. Okla. Turnpike

Authority,* 115 F.3d 1442, 1459 (10th Cir. 1997) ("If a federal claim and a state claim arise from

the same operative facts, and seek identical relief, an award of damages under both theories will

constitute double recovery") overruled on other grounds by *TW Telecom Holdings Inc. v.

Carolina Internet Ltd.,* 661 F.3d 495 (10th Cir. 2011).

Having cleared the liability hurdle, Plaintiffs bear the burden of proving damages.  *Baker

v. Barnard Constr. Co., Inc.,* 146 F.3d 1214, 1220 (10th Cir.1998) (citing *Anderson v. Mt.

Clemens Pottery Co.,* 328 U.S. 680, 687, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946), *superseded by

statute on other grounds as stated in Carter v. Panama Canal Co.*, 463 F.2d 1289, 1293

(D.C.Cir. 1972)).  An employee carries his burden by producing "sufficient evidence to show the

amount and extent of that work as a matter of just and reasonable inference." *Barnard Constr.

Col., Inc.*, 146 F.3d at 1220 (quoting *Anderson*, 328 U.S. at 687, 66 S.Ct. at 1192).  Upon such a

showing, "the burden shifts to the employer to produce evidence of the precise amount of work

performed or to negate the reasonableness of the inference drawn from the employee's evidence."

*Barnard Const. Col., Inc.*, 146 F.3d at 1220.

Under the FLSA, employers are required to "make, keep, and preserve" records of their

employees including "wages, hours, and other conditions and practices of employment." 29

U.S.C. § 211(c).  "The employer cannot complain that the damages lack the precision that would

have been possible if the employer had kept the records required by law." *Anderson*, 328 U.S. at 687-88, 66 S.Ct. at 1192.  If the employer does not rebut the employee's evidence, then the court may award damages even though the result is only approximate.  *Barnard Constr. Col., Inc.*, 146 F.3d at 1220.

      *1.   Plaintiffs' Calculations*

      Plaintiffs suggest three ways in which the court could calculate damages.  The first method is to determine what they earned in minimum wage and overtime payments applying their regular weekly work schedule and taking into consideration payments already received from Defendants.  This method would yield damages under the FLSA.  The second method is to extrapolate Plaintiffs' earnings throughout their employment by applying the average fees and tips generated in one month, as evidenced by one month's daily logs.  This method would yield damages under the CWCL.  The third method is to accept wholesale the amount that Plaintiffs allege Defendants owe in unpaid fees and tips, based on a snapshot of a "year to date" total, and pure recollection.

      Plaintiffs produced scant records documenting the actual hours they worked and the compensation they received.  They allege this dearth of documentation is due primarily to Defendants' "pay practices," and claim that Defendants irregularly compensated Plaintiffs with cash (sometimes a check) and never provided pay stubs.  The bulk of Plaintiffs' evidence includes their specific work schedule for each week of employment, and an email from Defendants' accounting manager admitting the Studio owed them money.  This evidence, though meagre, is nonetheless sufficient to meet the "just and reasonable inference" burden of proof that Plaintiffs performed work for which they were improperly compensated.  *See Barnard Constr. Col., Inc.*, 146 F.3d at 1220 (quoting *Anderson*, 328 U.S. at 687, 66 S.Ct. at 1192).

Consequently, at the December 18, 2013 evidentiary hearing, the court allowed Mr. Pantoja leave to produce any responsive evidence to Plaintiffs' alleged damages.

Mr. Pantoja produced daily logs dating from March 19, 2012 through September 16, 2012 for Mr. Gardner, and from July 23, 2012 through September 16, 2012 for Mr. Smith.[5] Defendant Pantoja also produced Living Art Tattoo Studio's (incomplete) bank statements from February 2012 through October 2012.   The daily logs document that Mr. Gardner generated $12,632 in his portion of fees and $1,215 in tips over a span of approximately 26 weeks.   The daily logs also document the amount Defendants paid Mr. Gardner each week, and whether payment was made by check or cash.   According to these logs, Defendants paid $11,200 to Mr. Gardner in checks and $857 in cash.   The logs also show that payments totaling $785 were paid to Mr. Gardner, but they fail to state whether that money was paid by cash or check.   Altogether, the payments equal $12,842, which is $1005 less than the amount Mr. Gardner supposedly earned.   Adding confusion is the fact that the Studio's bank statements account for only $8,005.50 in checks.   Finally, Defendants acknowledge owing Plaintiff Gardner $4,306.50 (doc. # 21-8).

Similar daily logs for Mr. Smith document that he generated $3,619 in his portion of fees and $283 in tips over a span of approximately eight weeks.   These logs show that Defendants paid him only $3,792 during that time.[6]   Checks account for $2,000 of that sum; it is unclear how or if Mr. Smith was paid for the remaining $1,792. The Studio's bank statements indicate that only $1,077 in checks were written to Mr. Smith, and Defendants acknowledge owing him

---

[5] For liability purposes I accepted as true Mr. Gardner's allegation that he worked 28 weeks for Defendants and Mr. Smith's allegation that he worked 16 weeks for Defendants.  Mr. Pantoja's daily logs indicate, however, that Mr. Gardner worked 26 weeks and Mr. Smith worked eight weeks.  The start of Mr. Smith's employment, July 23, 2012, is corroborated by the date on his lease agreement (doc. #21-2).

[6] There is a $110 discrepancy between Defendants' calculation of the fees and tips that Plaintiff Smith generated and the amount of compensation remitted.  The eight weeks' worth of logs purport to show that Mr. Smith received $3,792 in compensation.  The daily log for September 16, Mr. Smith's last day of employment, shows that Mr. Smith was credited for $3,619 total in his portion of fees recovered from sales and $283 in tips for a total of $3,902.

$3,274.50 (doc. # 21-8).  Mr. Pantoja has thus produced evidence to negate the reasonableness of certain inferences drawn by Plaintiffs, such as the extrapolation theory and the position that Defendants owe Mr. Gardner $12,312.50,[7] but not to rebut Plaintiffs' alleged damages in their entirety.

Defendants plainly owe some amount of money; however, the court's attempt to assign reasonable damages is complicated by the parties' failure to produce clear, consistent, or reliable evidence.  The dated lease agreement combined with Defendants' daily logs places into question Plaintiffs' length of employment.  Defendants' bank statements place into question the accuracy of their own daily logs. The parties' failure to present persuasive evidence in support of their respective positions forces the court, to some extent, to create baseline figures with which to calculate damages.  The relevant statutory law favors those plaintiffs whose employers failed to maintain adequate records.   However, I am not able to draw every inference in favor of Plaintiffs.  The court looks to the amount of money Defendants paid Plaintiffs in checks and the amount of money Defendants recorded owing Plaintiffs as of September 16, 2012.

2.      *Damages Under the Federal Labor Standards Act*

The first step in many FLSA disputes is to determine an employee's regular rate. *See Walling v. Youngerman–Reynolds Hardwood Co.,* 325 U.S. 419, 424, 65 S.Ct. 1242, 89 L.Ed. 1705 (1945) ("The keystone of Section 7(a) is the regular rate of compensation. On that depends

---

[7] Plaintiffs allege they accounted each day for the piercing fees collected, their half of the fees, and the tips received. Mr. Gardner included a log containing 30 days' worth of these accounts and Mr. Smith included a log containing 17 days' worth.  However, Mr. Gardner admitted at the December 18, 2012 evidentiary hearing that their work was not regular.  The daily logs supplied by Mr. Pantoja support the conclusion that business was inconsistent.  Thus, extrapolation from one month is not a reasonable means by which to calculate damages owed over 26 weeks or even eight weeks.  Mr. Gardner's argument that his damages award should reflect his "year to date" sales as of a random date is similarly unpersuasive.  The snapshot provided in Exhibit 7 to Mr. Gardner's Declaration is devoid of a date and otherwise contains no context.  Compared alongside Mr. Pantoja's logs, the snapshot is of the accounting from August 5, 2012, over a month before Mr. Gardner was fired.  Mr. Gardner has provided no basis for why the "year to date" sales on this particular date represents what Defendants owe him.

the amount of overtime payments which are necessary to effectuate the statutory purposes. The proper determination of that rate is therefore of prime importance."). The regular rate of compensation is "the hourly rate actually paid for the normal, non-overtime workweek." *Chavez v. City of Albuquerque*, 630 F.3d 1300, 1305 (10th Cir. 2001) (quoting *Walling v. Helmerich & Payne,* 323 U.S. 37, 40, 65 S.Ct. 11, 89 L.Ed. 29 (1944)). There is no hourly rate here from which I can apply, and Plaintiffs seek compensation at the minimum wage. Therefore, I apply the minimum wage as the regular rate.

a.    Back Pay

Mr. Gardner worked for 26 weeks at 48 hours a week and Mr. Smith worked for eight weeks at 42 hours a week.[8] The Studio's bank statements show that Mr. Gardner received at least $8,005.50, and Mr. Smith received at least $1,077 during their employment. According to Plaintiffs' calculations, their damages for unpaid minimum wages equal the difference between the compensation they would have received at $7.64 per hour worked, and the hours worked divided by the compensation received. Thus, Mr. Gardner, who worked 1,248 hours for Defendants, received compensation equaling $6.41 an hour.[9] Mr. Smith, who worked 336 hours for Defendants, received $3.21 an hour.[10] If Defendants had paid Plaintiffs an hourly minimum wage, Mr. Gardner would have received $9,534.72 over a 26-week period and Mr. Smith would have received $2,567.04 over an eight-week period. Plaintiffs' damages equal the documented amount they earned subtracted from what they should have earned in minimum wage

---

[8] Gardner: "Tuesday and Friday from 11:00 a.m. to 5:00 p.m." and "Saturday-Monday from 11:00 a.m. to 11:00 p.m." (Doc. #11 at p. 12; Doc. #11-1 at ¶ 11(f)). Smith: "Tuesday from 5:00 p.m. to 11:00 p.m.; Wednesday – Thursday from 11:00 a.m. to 11:00 p.m.; Friday from 5:00 p.m. to 11:00 p.m.; and Saturday from either 11:00 a.m. to 5:00 p.m. or from 5:00 p.m. to 11:00 p.m. depending on the week." (Doc. # 21 at p. 13; Doc. #21-1 at ¶ 11(f)).
[9] Division of $8,005.50 by 1,248 hours yields compensation of $6.41 an hour.
[10] Division of $1,077 by 336 hours yields compensation of $3.21 an hour.

compensation.  Defendants thus owe $1,529.22 in back wages to Mr. Gardner and $1,490.04 in back wages to Mr. Smith.

### b.      Overtime Wages

The FLSA requires employers to compensate employees at time and a half for overtime work.  29 U.S.C. § 207(a)(1).  Mr. Gardner worked eight hours of overtime each week for 26 weeks, which equals 208 hours in overtime.  Half of minimum wage in 2012 equaled $3.82 an hour.  Mr. Gardner worked $794.56 worth of overtime while employed by Defendants.  Mr. Smith worked two hours of overtime a week for eight weeks, which equals sixteen hours in overtime.  Mr. Smith therefore worked $61.12 worth of overtime.

### c.      Liquidated Damages

An employer who violates the FLSA may be liable for liquidated damages in an amount equal to unpaid wages and overtime compensation.  29 U.S.C. § 216(b).  The employer can avoid liquidated damages if it shows that it acted in good faith and had reasonable grounds for believing that the act or omission giving rise to the violation was not contrary to the FLSA.  29 U.S.C. § 260; *see Renfro v. City of Emporia, Kan.*, 948 F.2d 1529, 1540 (10th Cir. 1991) (recognizing that the "court may eliminate or reduce the award of liquidated damages only if the employer shows both that he acted in good faith and that he had reasonable grounds for believing that his actions did not violate the Act").  Liquidated damages under the FLSA are the norm rather than the exception.  *See* 29 U.S.C. § 260; *see also Koellhoffer v. Plotke-Giordani*, 858 F.Supp.2d 1181, 1192-93 (D.Colo. 2012).  Defendants defaulted.  Furthermore, Mr. Pantoja knew his business owed unpaid fees and tips to Plaintiffs but failed to pay.  Defendants are liable for liquidated damages under the FLSA.

In summary, I find that Defendants are jointly and severally liable for back wages, overtime pay, and liquidated damages under the FLSA amounting to an award of $4,647.56 for Mr. Gardner and $3,102.32 for Mr. Smith.

3.      *Damages Under the Colorado Wage Claim Act*

In light of Mr. Pantoja's records, the inferences required to award damages based on Plaintiffs' extrapolation theory, the amount of Mr. Gardner's "year to date" sales as of August 5, 2012, or Mr. Smith's recollection are not reasonable.  Considering all the available evidence, the most reasonable estimate of unpaid fees and tips are the figures as follows.

Mr. Gardner alleges Living Art Tattoo Studio paid him approximately $5,000. The Studio's bank statements contradict Mr. Gardner in that they show he received $8,005.50 in checks.  Defendant Pantoja's daily logs show that Mr. Gardner generated a total of $13,847 in fees and tips between March 19, 2012 and September 16, 2012.  The difference in the "year to date" sales evidenced by the daily logs and the amount Mr. Gardner was paid by check, as evidenced by the bank statements, is $5,841.50.  The evidence at hand supports this figure as the best approximation of unpaid compensation owed to Mr. Gardner.

Mr. Smith alleges Living Art Tattoo Studio paid him approximately $2,000. The Studio's bank statements demonstrate that Mr. Smith received $1,077 in checks.  Defendant Pantoja's daily logs show that Mr. Smith generated a total of $3,902 in fees and tips between July 23, 2012 and September 16, 2012.  The difference in the "year to date" sales evidenced by the daily logs and the amount Mr. Smith was paid by check, as evidenced by the bank statements, is $2,825. However, because Defendants admit to owing Mr. Smith $3,274.50, this larger number is the number on which I recommend basing the award.

The CWCA authorizes charging a penalty that is the greater of (i) 125% of the first $7,500 in wages that were not paid, and 50% of unpaid wages in excess of $7,500, or (ii) the employee's average daily earnings for each day, not to exceed ten days, until payment is made. Colo. Rev. Stat. Ann. § 8-4-109(3).  Multiplying Mr. Gardner's unpaid compensation by 125% results in a penalty of $7,301.88, which is the greater of the two penalties.[11]  Likewise, multiplying Mr. Smith's unpaid wages by 125% produces the greater penalty of $4,093.13.

The CWCA further authorizes a 50% increase of the penalty if the employer acted willfully in withholding wages.  Colo. Rev. Stat. Ann. § 8-4-109(3)(c).  Finding that Living Art Tattoo Studio acted willfully in withholding Plaintiffs' compensation, I recommend holding the Studio liable to Mr. Gardner for a penalty of $3,650.94, and to Mr. Smith for a penalty of $2,046.56.

In summary, I find Living Art Tattoo Studio liable under the CWCA for $16,794.32 to Mr. Gardner and $9,414.19 to Mr. Smith, for a total of $26,208.51.  Plaintiffs should receive damages under the CWCA because the statute nets a greater award than the FLSA.  However, the court can hold only the Studio liable under the CWCA.  With this limitation in mind, I recommend finding that Mr. Pantoja and Living Art Tattoo Studio are jointly and severally liable, at Plaintiffs' election, for an award of up to $7,749.88, which represents the full damages award under the FLSA, and Living Art Tattoo Studio is liable for the remaining $18,458.63 under the CWCA.

D.      *Attorney Fees*

The FLSA provides that "[t]he court ... shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of

---

[11] The percentage penalty is a great deal larger than the average of either of Plaintiffs' daily wages ($7.64) for ten days' time.

the action." *Bennett v. Coors Brewing Co.*, 189 F.3d 1221, 1238 (10th Cir. 1999) (quoting 29 U.S.C. § 216(b), *ruled unconstitutional on other grounds by Alden v. Maine,* 527 U.S. 706, 712, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999).

Courts have discretionary authority under the CWCA to award fees to any employee who recovers wages in an amount greater than the amount tendered by the employer. *See* Colo. Rev. Stat. Ann. § 8–4–110(1); *see also Graham*, 296 P.3d at 352. The court should consider several factors before awarding fees, including (1) the scope and history of the litigation, (2) the parties' relative ability to pay and the relative hardship, (3) the relative merits of the parties' positions, and (4) whether any claim or defense was frivolous, groundless, or asserted in bad faith. *Cf. Carruthers v. Carrier Access Corp.,* 251 P.3d 1199, 1211 (Colo.App. 2010) (listing factors that govern discretionary award of fees to an employer who prevails under the Wage Claim Act).

Plaintiffs ask for $4,620 in attorney fees for Mr. Gardner and $2,912 in attorney fees for Mr. Smith, for a total of $7,532 in fees. This amount is slightly less than a third of the total award of damages under the CWCA. The fee requests are supported in affidavits signed by Plaintiffs' counsel (doc. #11-9 and #21-9). Plaintiffs successfully argued entitlement to an award of unpaid compensation plus statutory penalties under the CWCA. Litigation lasted approximately one year, and Plaintiffs do not seek attorney fees for their counsel's time in preparing for and attending the two evidentiary hearings. Plaintiffs alleged that the Studio is engaged in interstate commerce and enjoys a gross annual income in excess of $500,000, which supports finding that an award of $7,532 should not cause severe financial hardship for the business. The parties' evidence of damages was contradictory and downright confusing at times, but there exists no doubt that Living Art Tattoo Studio withheld wages. Finally, Defendants

defaulted, and this court sees no basis for finding that either of Plaintiffs' two claims were frivolous, groundless, or asserted in bad faith.

Plaintiffs can recover under either the FLSA or the CWCA and both statutes provide for attorney fees.  Accordingly, I find that Defendant Pantoja and Defendant Living Art Tattoo Studio are jointly and severally liable for attorney fees in the amount of $7,532.

## CONCLUSION

For the foregoing reasons, this court RECOMMENDS that Plaintiffs' Motions for Default Judgment (doc. #11 and #21) be GRANTED.  I recommend that judgment be entered in favor of Mr. Gardner as follows: $4,647.56 jointly and severally under the FLSA; $12,146.76 under the CWCA for which Living Art Tattoo Studio is liable.

I recommend that judgment be entered in favor of Mr. Smith as follows: $3,102.32 jointly and severally under the FLSA; $6,311.87 under the CWCA for which Living Art Tattoo Studio is liable.

I further recommend awarding attorney fees and costs jointly and severally in the amount of $7,532 and $440, respectively.


**Advisement to the Parties**

Within fourteen days after service of a copy of the Recommendation, any party may serve and file written objections to the Magistrate Judge's proposed findings and recommendations with the Clerk of the United States District Court for the District of Colorado. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b);  *In re Griego*, 64 F.3d 580, 583 (10th Cir. 1995).  A general objection that does not put the District Court on notice of the basis for the objection will not preserve the objection for *de novo* review.  "[A] party's objections to the magistrate judge's

report and recommendation must be both timely and specific to preserve an issue for de novo

review by the district court or for appellate review." *United States v. One Parcel of Real

Property Known As 2121 East 30th Street, Tulsa, Oklahoma*, 73 F.3d 1057, 1060 (10th Cir.

1996).  Failure to make timely objections may bar *de novo* review by the District Judge of the

Magistrate Judge's proposed findings and recommendations and will result in a waiver of the

right to appeal from a judgment of the district court based on the proposed findings and

recommendations of the magistrate judge.  *See Vega v. Suthers*, 195 F.3d 573, 579-80 (10th Cir.

1999) (District Court's decision to review a Magistrate Judge's recommendation *de novo* despite

the lack of an objection does not preclude application of the "firm waiver rule"); *International

Surplus Lines Insurance Co. v. Wyoming Coal Refining Systems, Inc*., 52 F.3d 901, 904 (10th

Cir. 1995) (by failing to object to certain portions of the Magistrate Judge's order, cross-claimant

had waived its right to appeal those portions of the ruling);  *Ayala v. United States*, 980 F.2d

1342, 1352 (10th Cir. 1992) (by their failure to file objections, plaintiffs waived their right to

appeal the Magistrate Judge's ruling).  *But see, Morales-Fernandez v. INS*, 418 F.3d 1116, 1122

(10th Cir. 2005) (firm waiver rule does not apply when the interests of justice require review).

        DATED at Denver, Colorado, this 1st day of April, 2014.

                            BY THE COURT:


                           s/Craig B. Shaffer
                           United States Magistrate Judge